No. 22-1907

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Malcolm Wiener,

*Plaintiff-Appellant,*

v.

MIB Group, Inc. and
Jonathan Sager,

*Defendants-Appellees.*

On Appeal From An Order of Dismissal Of The United States District Court For The
District of Massachusetts, No. 1:22-cv-10799-WGY,
Before The Honorable William G. Young

REPLY BRIEF OF PLAINTIFF-APPELLANT MALCOLM WIENER

David G. Webbert, Esq. (#50820)
JOHNSON & WEBBERT, LLP
1 Bowdoin Mill Island, Suite 300
Topsham, ME 04086
(207) 623-5110
dwebbert@work.law

Megan C. Deluhery, Esq. (#99450)
TODD & WELD LLP
One Federal Street
Boston, MA 02110
(617) 720-2626
mdeluhery@toddweld.com

Carolyn T. Seely, Esq. (#1205751)
66 Vista Drive
Greenwich, CT 06830
(203) 661-9702
cswiener@yahoo.com

# Table of Contents

Table of Authorities .......................................................................iii

Introduction ................................................................................ 1

Argument...................................................................................... 4

    1. This Court's Recent *Webb* Decision, Analyzing What
       Privacy Violation Harms are Sufficient to Confer
       Standing, Strongly Supports Mr. Wiener's
       Standing ............................................................................ 4

    2. Defendants Distort the Record in the North Carolina
       Lawsuit, Which Directly Supports the Plausibility of Mr.
       Wiener's Injuries ............................................................. 6

    3. The FAC Plausibly Alleges the Financial Harm of
       Attorney's Fees in the North Carolina Lawsuit for
       Responding to Motions in Limine Relying on Defendants'
       Disclosure of his Confidential Information ..................... 11

    4. Mr. Wiener's Allegation of Emotional distress—for
       the Criminal Misuse of his Confidential Information to
       Help his Litigation Opponent—Separately and
       Independently Confers Standing .................................... 16

    5. Mr. Wiener's Harms From the Criminal Misuse of his
       Confidential Information by Defendants are Redressable
       in this Case .................................................................... 21

    6. Mr. Wiener Did Not Waive Any Claims During the Five-Minute
       Oral Argument that the District Court Terminated
       Prematurely .................................................................. 22

Conclusion ................................................................................. 22

Certificate of Compliance with Rule 32(a)(7) ............................... 25

Certificate of Service ........................................................................26

Addendum ........................................................................................27

# Table of Authorities

## Cases

*Becker v. Fed. Election Commission*
  230 F.3d 381 (1st Cir. 2000)..................................................................13

*Bolden v. Southeastern Penn. Transp. Auth.*
  21 F.3d 29 (3d Cir. 1994).......................................................................17

*Borges Colon v. Roman-Abreu*
  438 F.3d 1 (1st Cir. 2006)......................................................................16

*Carey v. Piphus*
  435 U.S. 247 (1978)......................................................................... 16, 18

*Clapper v. Amnesty Int'l USA*
  568 U.S. 398 (2013)...............................................................................20

*Garland v. Orlans, PC*
  999 F.3d 432 (6th Cir. 2021) .................................................................20

*In re Papatones*
  143 F.3d 623 (1st Cir. 1998)....................................................................7

*Kowalski v. Gagne*
  914 F.2d 299 (1st Cir. 1990).....................................................................7

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992)...............................................................................13

*Maddox v. Bank of N.Y. Mellon Tr. Co.*
  19 F.4th 58 (2d Cir. 2021) .....................................................................19

*Olsen v. Correiro*
  189 F.3d 52 (1st Cir. 1999) ................................................................7

*Pennell v. Glob. Tr. Mgmt., LLC*
  990 F.3d 1041 (7th Cir. 2021) ........................................................20

*TransUnion LLC v. Ramirez*
  141 S. Ct. 2190 (2021). ........................................................ passim

*Uzuegbunam v. Preczewski*
  141 S. Ct. 792 (2021) ......................................................................21

*Wadsworth v. Kross, Lieberman & Stone, Inc.*
  12 F.4th 665 (7th Cir. 2021) ..................................................... 20, 21

*Webb v. Injured Workers Pharmacy, LLC*
  72 F.4th 365 (1st Cir. 2023) ..................................................... passim

*Wiener v. AXA Equitable Life Insurance Co.*
  3:18-cv-00106-RJC-DSC (W.D.N.C.) .................................... passim

## Statutes

15 U.S.C. § 1681 ...................................................................... passim

15 U.S.C. § 1692(a) .......................................................................21

42 U.S.C. § 1983 ............................................................................17

*Restatement (Second) of Torts* § 914(2) (1970).....................................12

**Introduction**

Defendants' Brief violates the fundamental rule that motions to dismiss must be reviewed by indulging all reasonable inferences in the plaintiff's favor. They argue repeatedly that their unlawful disclosure of Mr. Wiener's confidential consumer information to life insurance company AXA was harmlessly "benign" because it was "truthful and accurate." Defs.' Br. at 8, 18, 19, 22. But the First Amended Complaint (FAC) alleges that Defendants' unlawful disclosure was made to assist AXA defend against a lawsuit filed by Mr. Wiener in North Carolina and that AXA misused that confidential information—both in "a dispositive motion" filed after the close of discovery and in testimony during trial—putting Mr. Wiener "at a substantial disadvantage in the litigation." RA15, 18.

Defendants further contravene the cardinal rule against interpreting the record in their favor when they rely on the public record from the North Carolina case; they make the remarkably one-sided argument that Mr. Wiener did not incur any "substantial" fees or that all his fees were for "meritless" claims in responding to their "seemingly benign" disclosure. Defs.' Br. at 17. In truth, the filings from the North Carolina case confirm that AXA repeatedly mischaracterized the confidential information unlawfully provided it by Defendants to falsely claim that no other insurer had ever ***seen*** the false medical information AXA negligently put

in Mr. Wiener's consumer file. Indeed, the court record shows that AXA relied on its distortion of the confidential information to argue—in pretrial motions, at trial, and in its post-trial motion to set aside the verdict—that it was impossible for Mr. Wiener to have been injured by AXA's false medical information. *See Wiener v. AXA Equitable Life Insurance Co.*, 3:18-cv-00106-RJC-DSC (W.D.N.C.) ("North Carolina lawsuit"), ECF Nos. 73, 74, 131, 138 at 24-26 (attached in Addendum at 8-10).

Defendants' Brief is also remarkable for what it fails to contest. While Defendants—MIB (a consumer information clearinghouse used by insurance companies) and its General Counsel, Jonathan Sager—argued extensively below that Mr. Wiener did not adequately plead a violation of the FCRA, they have waived that argument on appeal. Defendants no longer deny the legal sufficiency of Mr. Wiener's allegations to establish shocking, even criminal, violations of the Fair Credit Reporting Act (FCRA): Without any authorization or legal compulsion, Defendants—who were required by the FCRA to protect the privacy of consumers such as Mr. Wiener—deliberately sought out specific information in his consumer file and then volunteered it to his adversary in separate litigation, to help that adversary and harm the consumer. *See* 15 U.S.C. §§ 1681b, 1681n 1681o, 1681r. The FAC details how Defendants initiated a secret search of MIB's statutorily protected consumer records on Mr. Wiener; and then, without ever providing this

2

information to Mr. Wiener or even giving him notice of its existence, voluntarily and secretly turned over his especially protected "record of inquiries" information to his adversary in litigation pending in North Carolina; that adversary was Mr. Wiener's former life insurance company, AXA, which was a member company of MIB; and Mr. Sager then included this unlawfully disclosed information in a signed Declaration which AXA used to surprise Mr. Wiener on the eve of trial with a dispositive motion. *See* RA 15-18 (FAC ¶¶ 26-43). Given the FCRA's stated purpose "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, **impartiality**, and **a respect for the consumer's right to privacy**," 15 U.S.C. § 1681(a)(4) (emphasis added), it is hard to imagine a more fundamental and flagrant violation of the FCRA than what is alleged in the FAC.

With Defendants abandoning their argument that Mr. Wiener did not adequately plead a violation of his FCRA rights, for which the FCRA provides him a cause of action, Defendants' sole argument before this Court is that Mr. Wiener lacks standing or failed to adequately plead standing in his FAC. But Defendants wind up conceding the essential points showing that Mr. Wiener does have Article III standing. They acknowledge, as they must, that the FAC *does* allege both of the injuries Mr. Wiener relies upon as the basis for his standing to sue: (1) the cost of attorney's fees that Mr. Wiener had to incur to respond, in an already-pending

lawsuit with a third party, to the misleading information from his confidential file that Defendants wrongfully disclosed to his litigation adversary and that the adversary cited in a motion filed on the eve of trial; and (2) the distress caused to Mr. Wiener when he learned of a willful and criminal breach of his privacy rights by Defendants—a consumer reporting agency and its top lawyer who were specifically required by law to safeguard his privacy interests. *See* Defs.' Br. at 5 (quoting FAC ¶ 43).

Defendants argue that Mr. Wiener's allegations of his injuries lack "heft" or are "conclusory." But when the FAC is read as a whole and with all reasonable inferences drawn in the plaintiff's favor, as this Court requires, *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 373-74 (1st Cir. 2023), that argument collapses. And when Mr. Wiener's pleaded injuries are acknowledged, Defendants have no response to authorities establishing that financial costs and an invasion of privacy resulting in emotional distress each may constitute an injury in fact sufficient for standing under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).

## Argument

### 1.    This Court's Recent *Webb* Decision, Analyzing What Privacy Violation Harms Are Sufficient to Confer Standing, Strongly Supports Mr. Wiener's Standing.

On June 30, 2023, in a case directly on point, this Court reversed the dismissal of a suit alleging breach of confidentiality for lack of Article III standing.

*Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 374 (1st Cir. 2023). In

*Webb*, the two named plaintiffs filed a class action complaint alleging a breach of a

privacy interest in personal identifying information (PII) maintained by the

defendant, a pharmacy service, which was hacked by a third party. *See id.* at 365.

This Court emphasized that, "In applying the plausibility standard required at the

motion to dismiss stage, we must draw on our judicial experience and common

sense and read the complaint as a whole." *Id*. at 373-74 (cleaned up). The Court

also reiterated the maxim that, when deciding a motion to dismiss, "We must also

indulge all reasonable inferences in the plaintiffs' favor." *Id.* at 374 (cleaned up).

The lead plaintiff in *Webb* alleged that her stolen "PII was used to file a

fraudulent 2021 tax return, and she has 'expended considerable time'

communicating with the IRS to resolve issues associated with this false return." *Id.*

at 370 (cleaned up). Based on circumstantial evidence and inferences, including

suspicious timing between the data breach and the fraudulent tax return, this Court

held that the complaint plausibly alleged a connection between the data breach and

the third party's misuse of the leaked information to file the false return. *Id.* at 374.

Determining that "actual misuse of a plaintiff's PII resulting from a data breach" is

"a concrete injury," this Court held that the plaintiff had Article III standing. *Id.*

Applying the Supreme Court's guidance that "'an exact duplicate' of a traditionally

recognized harm is not required" to confer standing, *id.* at 372 (quoting

5

*TransUnion*, 141 S. Ct. at 2209), this Court held that "alleged actual misuse is closely related to the tort of invasion of privacy based on appropriation of another's name or likeness" which protects the interest of the individual in "exclusive use" of his own identity. *Id.* at 374. This is precisely what occurred here—Defendants violated Mr. Wiener's privacy and misused his personal information to disadvantage him in an ongoing litigation. Like the plaintiffs in *Webb*, he has standing to pursue these claims.

*Webb* is controlling authority in this case in at least three respects. First, it reaffirms the crucial points, which Defendants' Brief either denies or ignores, that the FAC must be read "as a whole" and with "all reasonable inferences in the plaintiffs' favor." Second, *Webb* leaves no doubt that the violation of a statutorily protected privacy interest resulting in harm to the victim from misuse of personal information constitutes a "concrete injury" sufficient for standing. Third, *Webb* reaffirms, contrary to Defendants' protests to the contrary, that where, as here, monetary damages would compensate a plaintiff for his injuries, such damages "satisfy the traceability and redressability" requirements for standing. *Id*. at 377.

2.    **Defendants Distort the Record in the North Carolina Lawsuit, Which Directly Supports the Plausibility of Mr. Wiener's Injuries.**

Defendants attack the plausibility of the injury allegations in the FAC based on mischaracterizing, in their favor, the court filings in the North Carolina

6

litigation.[1] But, when the record from the North Carolina case is viewed as a whole, it underscores how, as Mr. Wiener alleges, Defendants' admitted disclosure of his confidential consumer information to AXA was used against him in that lawsuit.

Specifically, the public record shows that Paragraph 15 of Mr. Sager's Declaration—which AXA produced based directly on the Defendants' initial unsolicited and unlawful disclosure of Mr. Wiener's confidential information about the record of "inquiries," and which Mr. Sager then signed and repeated in his testimony at trial—was repeatedly cited and used against Mr. Wiener by AXA in the lawsuit. For starters, on the eve of trial, AXA filed a motion to disqualify a critical expert witness for Mr. Wiener, in which it relied on the unlawful disclosure to falsely argue that it was impossible for Mr. Wiener to have been injured by AXA's negligent reporting because no insurer other than AXA had seen the false medical information. *See* North Carolina lawsuit, ECF No. 74, included at RA132

---

[1] *See* Defs.' Br. at 14 ("When reviewing an order of dismissal, in addition to the well-plead [sic] facts alleged in the complaint and the reasonable inferences we draw in plaintiff's favor, we may look to matters of public record and facts susceptible to judicial notice." (citation omitted)). *See generally In re Papatones*, 143 F.3d 623, 624 n.3 (1st Cir. 1998) ("[A]ppellate courts may notice another court's record as an adjudicative fact."); *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) (taking judicial notice of a murder conviction and stating that "[i]t is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand"), *quoted with approval in Olsen v. Correiro*, 189 F.3d 52, 64 (1st Cir. 1999).

(arguing opinion of Mr. Wiener's expert was irrelevant in part because no other insurance company "requested Mr. Wiener's MIB codes," citing Sager Declaration at ¶ 15).

AXA made this same misleading argument during trial and in its motion to throw out the verdict for Mr. Wiener. In response, Mr. Wiener's counsel had to expend time and effort to disentangle complex MIB terminology and to establish that a member company may view the MIB codes even if it does not make a formal "inquiry." *See* North Carolina lawsuit, ECF No. 138 at 24-26 (attached in Addendum at 8-10).

It is not only plausible, but indisputable, that Mr. Wiener's attorneys filed both a response and a surreply in opposition to AXA's potentially dispositive motion to disqualify his expert, which, if it had been granted, would likely have made it impossible for him to prove damages at trial. *See* North Carolina lawsuit, ECF Nos. 90, 97.

The public record from the North Carolina case also shows that AXA filed another motion in limine, entitled "To Preclude Evidence and Arguments Regarding the Increased Cost of Insurance," that further relied on paragraph 15 of the Sager Declaration. *See* North Carolina lawsuit, ECF No. 73 at 3 (attached in Addendum at 2). AXA argued in that motion that, "Neither of the insurance carriers that made conditional offers of insurance to Mr. Wiener had even seen the

8

MIB codes. Declaration of Jonathan Sager [at] ¶¶ 15, 18 (explaining that no MIB

carrier has ever requested the MIB codes Equitable reported)." *Id.* Once again, Mr.

Wiener's attorneys filed a response to this motion. North Carolina lawsuit, ECF

No. 88. Because that motion was granted (North Carolina lawsuit, ECF No. 109), it

became more difficult and expensive for Mr. Wiener to prove his damages at trial.[2]

The judicial record from the North Carolina lawsuit further proves that AXA

relied—both during trial and in its post-trial motion—on Defendants' unlawful

disclosure to attack Mr. Wiener's claim for damages.[3] Indeed, Mr. Wiener's

---

[2] Mr. Wiener's trial counsel advised the court during trial that Plaintiff was
"hamstrung a little bit by the motion in limine." North Carolina lawsuit, Tr.
364:13.

[3] Here is AXA's extensive argument based on the confidential information from
the Sager Declaration and Mr. Sager's corresponding trial testimony in its motion
to set aside the verdict:

> Mr. Wiener's theory also required him to prove that, if he is uninsurable, the
> MIB codes caused that problem. No evidence supports that theory of
> causation. The insurers who declined Mr. Wiener's applications did so based
> on his medical records alone. **None of those insurers reviewed Equitable's
> MIB codes. Indeed, the MIB's records show that no insurer has <u>ever</u>
> accessed those codes.**
> ***
> Mr. Burgess had no idea whether any insurer had even accessed the codes.
> Tr. 347:11. The MIB's records answer that question: No insurer has done so.
> **Tr. 434:8-435:7 [trial testimony of Sager].**
> ***
> To show causation under his theory of the case, Mr. Wiener had to show that
> insurers (1) looked at Equitable's MIB codes and (2) refused to insure Mr.
> Wiener because of those codes. . . . Mr. Wiener did not offer sufficient

counsel devoted five detailed paragraphs of his opposition to AXA's motion to set aside the verdict to rebut the lack-of-causation-of-damages defense based on Mr. Sager's testimony at trial. North Carolina lawsuit, ECF No. 138 at 24-26 (attached in Addendum at 8-10).

This case thus presents a more certain claim of injuries from the disclosure of private information than those upheld as sufficient for standing in *Webb*. No speculation is required to see that Mr. Sager admitted to violating Mr. Wiener's privacy rights under the FCRA by searching his confidential files regarding the "record of inquiries" and turning that information over to AXA, the adverse party in pending litigation filed by Mr. Wiener. Indeed, neither Mr. Sager nor MIB challenges on appeal the well-pled allegation that Mr. Sager violated the FCRA. Nor is there any need for conjecture to know that AXA explicitly cited the confidential information provided by Mr. Sager in a Declaration (and trial testimony) to support pre-trial and post-trial motions intended to defeat Mr. Wiener's case, and that Mr. Wiener's attorneys filed responses to those motions

---

evidence on either of those points. **First, the MIB's own records show that no insurer has ever accessed Mr. Wiener's MIB codes. Tr. 435:6-7.**

North Carolina lawsuit, ECF No. 131 at 2, 4, 14 (emphasis added) (attached in Addendum at 4-6).

and at trial both cross-examined Mr. Sager's testimony about the lack of "inquiries" and presented witness testimony to rebut it.

### 3. The FAC Plausibly Alleges the Financial Harm of Attorney's Fees in the North Carolina Lawsuit for Responding to Motions in Limine Relying on Defendants' Disclosure of his Confidential Information.

Mr. Wiener had to incur attorney's fees to respond to motions in limine that relied on the improper disclosure in the Sager Declaration, including opposing AXA's motion in limine to exclude Mr. Wiener's expert. *See* North Carolina lawsuit, ECF No. 74, included at RA132 (relying on Mr. Sager's disclosure concerning record of inquiry information from Mr. Wiener's MIB file). As detailed above, his counsel also had to devote resources to rebutting Mr. Sager's disclosure of confidential information at trial and in post-trial briefing.

Defendants incorrectly respond that this allegation of financial harm is too speculative or vague. Defs.' Br. at 18. But the FAC's allegations that Mr. Wiener had to expend attorneys' fees to respond to a litigation adversary's use of Defendants' willful disclosure of Mr. Wiener's private information are neither "conclusory" nor "unfounded speculation." The FAC refers to money already spent, not fees that Mr. Wiener "owes or will eventually owe," as the Defendants contend. *See* Defs.' Br. at 18. This is a very specific concrete financial harm that has actually occurred because of Mr. Wiener's need to file responses to motions in

11

limine. And those motions explicitly cited and relied on that confidential

information. No speculation is involved.

Unlike in the cases cited by Defendants, Mr. Wiener does not seek to base

his claim to standing on the attorney's fees he expends in *this* suit under the FCRA,

nor does he rely upon any attorney's fees incurred to investigate, evaluate, or

obtain an opinion as to whether Defendants violated the FCRA. Attorney's fees

incurred to defend or establish rights in a *separate* lawsuit, including incremental

fees as claimed here, constitute actionable injury both as a matter of common sense

and a matter of law. *See* Pl.'s Br. at 28-32; *see also Rest. (Second) of Torts* §

914(2) (1970) ( "One who through the tort of another has been required to act in

the protection of his interests by bringing or defending an action against a third

person is entitled to recover reasonable compensation for loss of time, attorney fees

and other expenditures thereby suffered or incurred in the earlier action.").

Perhaps recognizing that their legal authorities are unavailing, Defendants

improperly jump to the merits with a series of misplaced claims that Mr. Wiener

cannot possibly prove he actually incurred additional attorney's fees, or if he did,

he cannot prove they meet an imaginary threshold of "substantial financial harm."

*See* Defs.' Br. at 16-17.

*First*, Defendants claim Mr. Wiener's allegation of financial harm is purely

hypothetical because he included a request for attorney's fees and costs in his

complaint in the North Carolina case. *See* Defs.' Br. at 15-16; RA14. Noting that

the Fourth Circuit has now restored the liability verdict in that case and remanded

for further proceedings on damages, Defendants contend Mr. Wiener's injury has

now been rendered "conjectural and hypothetical" due to the possibility he could

be reimbursed for all his attorney's fees in the North Carolina case. Standing is

analyzed based on the facts as they existed at the time the FAC was filed. *See*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992); *Becker v. Fed.*

*Election Commission*, 230 F.3d 381 (1st Cir. 2000) (holding that Article III

standing is analyzed based on facts existing at time complaint is filed, and doctrine

of mootness may apply to evaluate the issue at later stages). When Mr. Wiener

filed the FAC, judgment had been entered in favor of AXA, and his appeal was

pending before the Fourth Circuit.

In any event, Mr. Wiener's financial injury cannot be rendered moot because

he is no longer seeking an award of attorney's fees in the North Carolina case. His

North Carolina court complaint contained a claim for unfair and deceptive trade

practices, which included a request for attorney's fees. *See* North Carolina lawsuit,

ECF No. 1-2 at 11. The court dismissed that claim on summary judgment. *Id.*, ECF

No. 63. Thus, not only has Mr. Wiener not been awarded his attorney's fees in the

North Carolina litigation, he no longer has a claim seeking a fee award.

*Second*, Defendants invite the Court to discount Mr. Wiener's allegation that he suffered financial harm because his wife was "one of his attorneys." Defs.' Br. at 16. This argument is both false and irrelevant. As the court records show, Mr. Wiener's wife did not enter an appearance in the North Carolina litigation. Rather, Mr. Wiener's lead counsel was Attorney Kerry Traynum, who signed Mr. Wiener's responses to AXA's motions in limine that relied on the Sager Declaration and who handled the trial as first chair. *See, e.g.,* RA32 (examination of Mr. Sager at trial by Attorney Kerry Traynum); North Carolina lawsuit, ECF Nos. 88, 90 (responses of Mr. Wiener to AXA's motions in limine, signed by Attorney Kerry Traynum).[4] And, contrary to Defendants' suggestion, having a spouse who is an attorney does not mean that all other lawyers will represent you for free.

*Third*, Defendants claim that Mr. Wiener's financial harm was not "substantial," but they cite no authority which requires some specific quantum of financial harm to confer standing. In any event, it is more than plausible that the attorney's fees would be "substantial" for responding to a motion to exclude a key

---

[4] As the trial was conducted during the height of the pandemic, Mr. Wiener was allowed to testify remotely, and his wife acted as his surrogate at trial. She was thus allowed to sit at counsel's table as the plaintiff in lieu of Mr. Wiener, not as an attorney representing Mr. Wiener.

14

expert in a trial over the inability to procure $16,000,000 in life insurance, which resulted in an $8,000,000 verdict.

Defendants also contend Mr. Wiener did not plead "how, when, where, why and to whom Wiener owes or will eventually owe attorney's fees." Defs.' Br. at 18. But this level of detail greatly exceeds what this Court requires when reviewing a pre-discovery grant of a motion to dismiss for lack of standing, when the Court applies "the same plausibility standard used to evaluate a motion under Rule 12(b)(6)." *Webb*, 72 F.4th at 371. In *Webb*, this Court did **not** require plaintiffs to plead "how, when, where, why and to whom" about the alleged financial harm they "suffered or are at an increased risk of suffering," which was a "delay in receipt of tax refund monies" due to the filing a false tax return. *Id.* at 374. And here  ample details describe Mr. Wiener's alleged financial harm: (1) Mr. Sager made a voluntary disclosure to AXA of Mr. Wiener's confidential information; (2) AXA put that disclosure in a Declaration signed by Mr. Sager; (3) Defendants aided Mr. Wiener's litigation adversary by reviewing and signing the Declaration; (4) AXA cited and used the Declaration in potentially dispositive motions in limine to defeat or limit Mr. Wiener's case, including to knock out his key expert witness; (5) Mr. Wiener's attorneys filed responses to those motions, including to preserve his expert's evidence of causation, which was necessary to make out his claim for damages; and (6) Mr. Wiener's attorneys needed to respond to the information in

15

the Sager Declaration and his corresponding trial testimony, and the post-trial

arguments by AXA citing Mr. Sager's testimony. These fees, already incurred in

an earlier litigation, constitute a cognizable injury that confers standing on Mr.

Wiener. *See* Pl.'s Br. at 28-29.

> **4.     Mr. Wiener's Allegation of Emotional Distress—for the Criminal Misuse of His Confidential Information to Help His Litigation Opponent—Separately and Independently Confers Standing.**

In addition to the financial harm Mr. Wiener suffered by having to expend

attorney's fees responding to the motions in limine that relied on the Sager

Declaration, Mr. Wiener suffered emotional harm caused by the betrayal of

Defendants when they committed the crime of volunteering his FCRA-protected

confidential information to his litigation adversary. This type of intangible injury

for the unlawful disclosure of private information is highly plausible and well

recognized in the law, especially given the aggravating factors that Defendants

intentionally and criminally violated a position of trust under the FCRA, which

requires them to "exercise their grave responsibilities with fairness, **impartiality**,

and **a respect for the consumer's right to privacy**." 15 U.S.C. § 1681(a)(4)

(emphasis added).

As the Supreme Court recognized in *Carey v. Piphus*, 435 U.S. 247, 263

n.20 (1978), "[d]istress is a personal injury familiar to the law." *See also Borges

Colon v. Roman-Abreu*, 438 F.3d 1, 21 (1st Cir. 2006) (upholding damages award

based in part on "mental anguish"); *Bolden v. Southeastern Penn. Transp. Auth.*, 21 F.3d 29, 33-34 (3d Cir. 1994) (affirming jury verdict of $250,000 for emotional distress in Section 1983 case based on testimony of family members and friends without any supporting medical evidence). And distress is a concrete injury, long recognized at common law, and thus sufficient to confer Article III standing. *See TransUnion*, 141 S. Ct. at 2204 (holding that "intangible harms" with "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," like "disclosure of private information, and intrusion upon seclusion" can supply standing).[5]

That Defendants' betrayal of Mr. Wiener's trust and **criminal** violation of his confidentiality rights under the FCRA to aid his litigation adversary caused Mr. Wiener distress is a straightforward allegation that supports his standing here. MIB is a consumer reporting agency with statutory duties to consumers to protect their privacy. Despite Defendants' charge of safeguarding consumer information and

---

[5] Indeed, the FCRA specifically identifies ensuring that consumer reporting agencies demonstrate "respect for the consumer's right to privacy" as one of its primary objectives. 15 U.S.C. § 1691(a)(4). And while Defendants quibble that Mr. Wiener did not use the magic words "invasion of privacy" in the FAC, the FAC repeatedly alleges that Defendants violated Mr. Wiener's FCRA-protected privacy rights. *See*, *e.g.*, RA24 (member companies must "adhere to various rules" of MIB "in order to protect the privacy" of consumers); RA10 (complaint filed due to Defendants' "unauthorized and therefore unlawful disclosure of private information"); RA16 (the disclosure "revealed protected information of Mr. Wiener"); RA18 (noting the "voluntary disclosure of Wiener's private, consumer report information").

17

Mr. Wiener's right to privacy in that information, they chose to volunteer information to AXA who they knew was involved in "some controversy" with Mr. Wiener. RA31. MIB and Mr. Sager favored the party with an ownership stake in MIB over the consumer whose privacy they were legally obligated to protect. The criminal disclosure was intended to help AXA defend itself in a suit brought by Mr. Wiener. Given the lack of any legitimate explanation, it is reasonable to infer that MIB and Mr. Sager made the search of Mr. Wiener's confidential consumer files, reached out to AXA to provide the information, and then signed the Declaration so AXA could file it in support of their pre-trial motions to limit or defeat Mr. Wiener's case. Further, the disclosure to AXA and use of the information in the lawsuit was timed to cause maximum harm: just before trial when Mr. Wiener had no ability to take formal discovery and little time to engage in his own investigation of these new facts. Mr. Wiener's distress is more than plausible under these circumstances.

Defendants protest that the FAC does not use the terms "mental" or "emotional" in referring to the "distress" caused by Defendants. Defs.' Br. at 19. But when the FAC is read as a whole, there can be little doubt about the kind of "distress" to which it refers. *See Carey*, 435 U.S. at 263 n. 20 (noting that "[w]e use the term 'distress' to include mental suffering or emotional anguish"). And while Defendants repeatedly describe Mr. Sager's illegal disclosures as "benign,"

the actual misuses of the disclosures—to confuse the trial judge two weeks before

the scheduled trial date in an attempt to preclude the crucial evidence of Plaintiff's

expert; to confuse the jury at trial about whether other insurers looked at the false

medical codes reported to MIB by AXA about Mr. Wiener; and to persuade the

trial judge to throw out the verdict—were hardly benign. It could and did cause

significant, understandable distress.

      Defendants rely on inapposite, out-of-circuit cases to claim that distress does

not confer Article III standing. *See* Defs.' Br. at 9. Contrary to the Defendants'

intimations, the Second Circuit case cited by Defendants correctly states that "great

stress, mental anguish, anxiety, and distress" *were* injuries that could provide

standing under *TransUnion*. *Maddox v. Bank of N.Y. Mellon Tr. Co.,* 19 F.4th 58,

65 (2d Cir. 2021). The *Maddox* court made the case-specific finding that the

plaintiff there had not alleged why the defendants' conduct would cause her

distress. *Id.* at 66. Mr. Wiener's allegations, however, do provide sufficient

information to understand why the Defendants' eve-of-trial betrayal—a targeted

and criminal effort to use private information to hurt a consumer—caused him

distress.

      The other cases cited by Defendants all concern a different statute, the Fair

Debt Collection Practices Act (FDCPA), and reject plaintiffs' claimed anxiety and

stress as a concrete injury when they allege only a technical statutory violation,

with no link to any adverse consequences that affected the plaintiff. *See Pennell v. Glob. Tr. Mgmt., LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021) (finding the plaintiff failed to articulate how a debt collector's letter "led her to change her course of action or put her in harm's way. Instead, she merely pointed to a statutory violation, which is not enough to establish standing under Article III."); *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021) (specifically applying FDCPA precedent to find that a plaintiff could not bring a claim for "stress" without any allegations about how the statutory violation affected her); *Garland v. Orlans, PC*, 999 F.3d 432, 440 (6th Cir. 2021) (finding the plaintiff lacked standing to bring a claim under the FDCPA because the plaintiff's anxiety was "too speculative to qualify as an injury in fact because it is merely a fear of a future harm that is not 'certainly impending'—an injury insufficient under Supreme Court precedent" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013))).

These cases are not on point. The unlawful disclosure of Mr. Wiener's confidential insurance information by a consumer reporting agency led to very specific adverse consequences, namely the Sager Declaration that was used to support motions filed against Mr. Wiener on the eve of trial. And Mr. Wiener, unlike the plaintiffs in the FDCPA cases, alleged that his distress was caused by a violation of his privacy interests, which closely aligns with the sort of common law

torts that courts recognize as conferring standing. *See Wadsworth*, 12 F.4th at 668 (recognizing that "abusive debt-collection practices lead to . . . 'invasions of individual privacy,'" which would be a "concrete harm" under the FDCPA) (quoting 15 U.S.C. § 1692(a)).

### 5. Mr. Wiener's Harms from the Criminal Misuse of His Confidential Information by Defendants Are Redressable in this Case.

Defendants incorrectly argue that the injuries pleaded in the FAC are not plausibly redressable here. Mr. Wiener filed a two-count complaint. The first claim alleges a violation of 15 U.S.C. § 1681n, under which Mr. Wiener seeks to recover, at least, "nominal damages." RA19. The Supreme Court has held that nominal damages meet the redressability requirement of Article III standing. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021) ("Because nominal damages were available at common law in analogous circumstances, we conclude that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.").

Mr. Wiener also seeks compensation for the attorney's fees expended in responding to the motions in limine that relied on the Sager Declaration and for his emotional distress caused by the disclosure of his private information. Money damages, of course, are the standard form of redress in civil cases. *Webb* leaves no

doubt on this point: "Monetary relief would compensate the plaintiffs for their injuries, rendering the injuries redressable." 72 F.4th at 377 (cleaned up).[6]

### 6. Mr. Wiener Did Not Waive Any Claims During the Five-Minute Oral Argument that the District Court Terminated Prematurely.

Defendants curiously rely heavily on the transcript of the five-minute hearing in the District Court. *See* Defs.' Br. at 5-7, 9, 23-24. That transcript, however, shows that Mr. Wiener's counsel stated that he had suffered two harms, one being an invasion of privacy, before being cut off. It also demonstrates that his counsel was never permitted to identify or discuss the second harm because the District Judge abruptly terminated the argument after five minutes. Given this record, it cannot reasonably be argued that Mr. Wiener's counsel waived any claims at oral argument. Defendants cite no authorities, and Plaintiff knows of none, holding that a dispositive motion should be granted based in whole or in part on counsel's inability at oral argument—due to a shortage of time—to lay out an argument that was adequately set forth in the Plaintiff's written arguments.

### Conclusion

This case presents stronger allegations of concrete injuries than those that were upheld as sufficient for standing in this Court's *Webb* decision. Unlike *Webb*,

---

[6] For standing purposes, it does not matter if these "harms may be difficult to prove or measure." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2211 (2021).

this case does not involve mere negligence in overseeing confidential consumer information leading to inadvertent disclosure. The invasion of privacy here is even more disturbing. The very company (MIB) charged with safeguarding Mr. Wiener's consumer file, and the very person (General Counsel Sager) who best understood those requirements, on their own initiative searched Mr. Wiener's private consumer records and volunteered confidential information protected by the FCRA to the consumer's litigation adversary for an improper purpose: to provide support for motions filed against the consumer in his lawsuit and, thereby, cause the consumer to incur attorney's fees to respond and to suffer distress upon learning of Defendants' criminal betrayal of his privacy rights. To be sure, this is not some new gloss on the FAC; this is what the complaint as a whole plausibly (if not verbatim) alleged. *See* Pl.'s Br. at 15-17. When the FAC is evaluated "as a whole" and indulging "all reasonable inferences in the plaintiff's favor," it plausibly alleges criminal conduct by Defendants and a direct link from that criminal conduct to both (1) financial harms, in the form of increased attorneys' fees in a prior lawsuit, and (2) emotional distress harms to Mr. Wiener. Thus, it is clear that "the complaint plausibly demonstrates the plaintiff's standing to seek damages," *Webb*, 72 F.4th at 369 (cleaned up), and the decision below must be reversed.

Date:  August 18, 2023                    Respectfully submitted,


/s/ David G. Webbert
David G. Webbert, Bar No. 50820
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Telephone: (207) 623-5110
Email: dwebbert@work.law


/s/ Megan C. Deluhery
Megan C. Deluhery, Bar No. 99450
TODD & WELD LLP
One Federal Street
Boston, MA 02110
Telephone: (617) 720-2626
Email: mdeluhery@toddweld.com


/s/ Carolyn T. Seely
Carolyn T. Seely, Bar No. 1205751
66 Vista Drive
Greenwich, CT 06830
Telephone: (203) 661-9702
Email: cswiener@yahoo.com

*Attorneys for Plaintiff-Appellant*

**Certificate of Compliance with Rule 32(A)(7)**

I certify that this reply brief complies with the type-volume limitation of F.R.A.P. 32(a)(7)(B) because it contains 5,647 words, excluding the parts of the brief exempted by the Rule. This reply brief complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6), in that is has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman typeface, 14-point size.

Date: August 18, 2023

/s/ David G. Webbert
David G. Webbert, Bar No. 50820
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Telephone: (207) 623-5110
Email: dwebbert@work.law

*Attorney for Plaintiff-Appellant*

**Certificate of Service**

I, David G. Webbert, hereby certify that on August 18, 2023, I electronically filed Plaintiff-Appellant's Reply Brief with the U.S. Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system.

Date: August 18, 2023       /s/ David G. Webbert
                                David G. Webbert, Bar No. 50820
                                Johnson & Webbert, LLP
                                1 Bowdoin Mill Island, Ste. 300
                                Topsham, ME 04086
                                Telephone: (207) 623-5110
                                Email: dwebbert@work.law

                                *Attorney for Plaintiff-Appellant*

# Addendum

### Relevant Short Excerpts from Court Record in
### *Wiener v. AXA Equitable Life Ins. Co*., Case Nos. 3:18-cv-00106 (W.D.N.C.)

### Table of Contents

Defendant AXA Equitable Life Insurance Company's
Motion in Limine Regarding the Increased Cost of
Insurance; 3:18-cv-106-RJC-DSC
(ECF 73, p. 1, 3)........................................................................Add. 1

Defendant AXA Equitable Life Insurance Company's
Brief in Support of Equitable Motions to Dismiss
And for Post-Trial Relief; 3:18-cv-106-RJC-DSC
(ECF 131, p. 1, 2, 4, 14)............................................................Add. 3

Plaintiff's Memorandum of Law in Opposition
To Defendant's Motions to Dismiss and for
Post Trial Relief; 3:18-cv-106-RJC-DSC
(ECF 138, p. 1, 24-26)  ............................................................Add. 7

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| MALCOLM WIENER,<br><br>        Plaintiff,<br><br>  v.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY,<br><br>        Defendant. | No. 3:18-CV-106-RJC-DSC |

**DEFENDANT AXA EQUITABLE LIFE INSURANCE COMPANY'S MOTION
TO PRECLUDE EVIDENCE AND ARGUMENTS REGARDING
THE INCREASED COST OF INSURANCE**

Defendant Equitable Financial Life Insurance Company (f/k/a AXA Equitable Life Insurance Company) ("Equitable") hereby moves for an Order precluding Plaintiff from arguing or presenting evidence that damages should be awarded based on any supposed increase to the cost of life insurance for Mr. Wiener.

### PRELIMINARY STATEMENT

For three independently sufficient reasons, Plaintiff should be foreclosed from asserting or adducing evidence that Equitable's reporting of MIB codes caused the price of life insurance for Mr. Wiener to increase—which would be a brand new theory of damages. First, Plaintiff did not plead and has never asserted any such theory of damages, and no discovery was taken on the issue. It is too late for Plaintiff to attempt to pivot from arguing that Equitable's negligence rendered him

judgment advances that position again: "Defendant's actions have caused Wiener damages by rendering him uninsurable." (Dkt. No. 48 at 18; *see also id.* at 21 ("Defendant's actions have rendered Plaintiff uninsurable . . . .").)

The time for a new theory of damages has long passed. The parties conducted fact and expert discovery based on Plaintiff's original theory of the case. No discovery was conducted on any purported impact of adverse MIB codes on the price of insurance. There is instructive precedent from within the Fourth Circuit on this issue: in *AGF Inc. v. Columbia Gas Transmission Corp.*, the court granted a motion *in limine* to preclude testimony to support "a new damages theory" that was "never alleged" and raised after discovery. *See AGF, Inc. v. Columbia Gas Transmission Corp.*, 2009 WL 2213477, at *2 (S.D.W. Va. July 21, 2009). "Plaintiff's failure to present that theory in a timely fashion," the court found, "deprived Defendant of its right and opportunity to pursue relevant discovery." *Id.* For the same reasons, Plaintiff should be precluded from claiming damages based on a supposed increase in the cost of life insurance. Such a theory would run counter to his position from the beginning of the case that he is categorically uninsurable.

## II.    ANY ARGUMENT OR TESTIMONY THAT EQUITABLE MADE LIFE INSURANCE MORE EXPENSIVE FOR MR. WIENER WOULD BE DEMONSTRABLY FALSE.

Any testimony or arguments about a supposed delta between the price of insurance Plaintiff was offered and the hypothetical price of insurance in the absence of MIB codes would be objectively baseless. There is no delta. Neither of the insurance carriers that made conditional offers of insurance to Mr. Wiener had even seen the MIB codes. (*See* Declaration of Jonathan Sager, Motion *in Limine* to Preclude Expert Testimony, Ex. E, ¶¶ 15, 18 (explaining that no MIB carrier has ever requested the MIB codes Equitable reported); Robbins Dep. Tr., Motion *in Limine*

-3-

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:18-CV-106-RJC-DSC

| | | |
|---|---|---|
| MALCOLM WIENER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **BRIEF IN SUPPORT OF** |
| v. | ) | **EQUITABLE'S MOTIONS** |
| | ) | **TO DISMISS AND FOR** |
| AXA EQUITABLE LIFE INSURANCE | ) | **POST-TRIAL RELIEF** |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case was tried on a single, narrow claim: that Equitable, by reporting codes to the Medical Information Bureau, made plaintiff Malcolm Wiener uninsurable. More specifically, Mr. Wiener argued that Equitable's MIB codes deterred every insurer from even starting the underwriting process. Based on that theory of negligence, the jury awarded Mr. Wiener eight million dollars.

Although jury trials play an important role in our justice system, the law invalidates verdicts that are rendered in the absence of subject-matter jurisdiction. See Fed. R. Civ. P. 12(h)(3). The law also bars verdicts that lack a legally sufficient evidentiary basis. See id. Rule 50(a). This case has both of those defects. Those defects call for the Court to set aside the verdict.

First, the Court lacks subject-matter jurisdiction over Mr. Wiener's negligence claim. A North Carolina insurance statute creates exclusive remedies for the conduct at issue here: an insurer's disclosure to an insurance-support organization. The same statute expressly immunizes insurers from negligence claims like Mr. Wiener's. That immunity defeats federal subject-matter jurisdiction over this case.

Second, Mr. Wiener did not offer legally sufficient evidence on causation and injury:

- Mr. Wiener's central theory of injury—that he is uninsurable because no insurer will even start the underwriting process for him—is refuted by the fact that two insurers gave him preliminary offers of insurance.  He just chose not to follow up on those offers.

- Mr. Wiener's theory also required him to prove that, if he is uninsurable, the MIB codes caused that problem.  No evidence supports that theory of causation.  The insurers who declined Mr. Wiener's applications did so based on his medical records alone.  None of those insurers reviewed Equitable's MIB codes.  Indeed, the MIB's records show that no insurer has <u>ever</u> accessed those codes.

- Mr. Wiener's theory of causation also required him to show that, if not for the MIB codes, he would have obtained a life insurance policy.  Mr. Wiener introduced no evidence on that point either.  No witness testified that at the end of an underwriting process, Mr. Wiener, at his advanced age, would have qualified for a new life insurance policy.

Finally, Mr. Wiener's evidence on damages departed from the governing law. Mr. Wiener claims that Equitable's actions stopped him from getting a new policy.  His damages evidence, however, focused on the death benefit under his <u>old</u> policies.  That evidence did not satisfy the measure of damages that governs a case like this one:  the net value of the new policy that Mr. Wiener could buy on an unencumbered market.

The verdict here clashes with all these points of law.  The lack of subject-matter jurisdiction calls for the Court to dismiss Mr. Wiener's lawsuit.  Mr. Wiener's failure to offer legally sufficient evidence on causation and injury calls for judgment as a matter of law or a new

That theory runs headlong into Mr. Wiener's own evidence. Two insurers (The Principal and Security Mutual) made preliminary offers to Mr. Wiener for a new policy. Tr. 113:24-114:4, 116:5-15. He and his wife, however, chose not to pursue those offers. Tr. 84:22-25.

Five other insurers, it is true, declined to offer Mr. Wiener a policy. Tr. 120:12-19. But "[n]one of them reviewed MIB codes." Tr. 120:18. So testified Sandy Robbins, a broker who contacted these insurers on Mr. Wiener's behalf.

Mr. Burgess, likewise, could not identify a single insurer that made an adverse decision based on Mr. Wiener's MIB codes. Tr. 347:3-11. Mr. Burgess had no idea whether any insurer had even accessed the codes. Tr. 347:11. The MIB's records answer that question: No insurer has done so. Tr. 434:8-435:7. The insurers who declined to offer Mr. Wiener a policy did so based on his medical records alone. Tr. 112:7-12, 120:16-19.

On but-for causation and injury, no witness testified that Mr. Wiener would have ultimately obtained a policy if Equitable had not disclosed its codes to the MIB.

On damages, no witness testified to the net present value of any policy that Mr. Wiener would have obtained in the absence of the MIB codes. Instead, Mr. Burgess simply told the jury that Mr. Wiener's damages should be measured as $16 million, the total death benefit of Mr. Wiener's former policies with Equitable. Tr. 328:14-18. Those are the policies that Mr. Wiener is trying to have reinstated through his New York lawsuit.

In his closing argument, Mr. Wiener argued for an indictment of the entire life insurance industry and encouraged the jurors to put themselves in Mr. Wiener's shoes. See Tr. 480:24-482:14; see also Tr. 493:18-19 ("God forbid any of us ever go to the doctor about a condition that we aren't sure we have.").

4

that argument was not Mr. Wiener's theory of injury.  See Doc. No. 109, at 7.  Instead, he argued

that because of the MIB codes, his applications for insurance would fail at the threshold.  Tr.

21:9-23, 496:14-18.

Moreover, even if Mr. Wiener could switch theories now, any claim of cost-based

uninsurability would fail for lack of evidence.  Mr. Wiener offered no expert testimony, or any

other evidence, that an increase in premiums makes a high-net-worth person like him

"uninsurable."

In sum, The Principal's and Security Mutual's offers to insure Mr. Wiener defeat his

claim that he is uninsurable.  Mr. Wiener did not follow up on those two offers, but that choice

cannot negate the fact that he received the offers.  See Tr. 84:22-25.  Mr. Wiener's lack of proof

of injury calls for judgment in Equitable's favor.

**B.    Mr. Wiener did not offer sufficient evidence that the MIB codes caused any
        lack of insurability.**

Even if Mr. Wiener had shown that he is uninsurable, his case would still fail for lack of

actual and proximate causation.  Mr. Wiener offered no evidentiary link between the alleged

causal agent (the MIB codes) and the alleged injury (uninsurability).

To show causation under his theory of the case, Mr. Wiener had to show that insurers

(1) looked at Equitable's MIB codes and (2) refused to insure Mr. Wiener because of those

codes.  See, e.g., MacFadden v. Louf, 643 S.E.2d 432, 435 (N.C. Ct. App. 2007) (explaining that

a claim based on a representation must show reliance on the representation).  Mr. Wiener did not

offer sufficient evidence on either of those points.

First, the MIB's own records show that no insurer has ever accessed Mr. Wiener's MIB

codes.  Tr. 435:6-7.  Mr. Burgess admitted that he has no idea whether any insurer accessed

those codes.  Tr. 347:7-11.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No: 3:18-CV-106

| | |
|---|---|
| MALCOLM H. WIENER,<br><br>Plaintiff,<br><br>v.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY, LLC,<br><br>Defendant. | PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS AND FOR POST-TRIAL RELIEF |

## PRELIMINARY STATEMENT

After two and a half years of litigation that culminated in a jury verdict in favor of Plaintiff Malcolm Wiener ("Wiener"), Defendant AXA Equitable Life Insurance Company ("Defendant") now attacks the bookends of this lawsuit—jurisdiction and verdict—in a desperate attempt to avoid the Court's judgment.  Defendant's post-trial Motion to Dismiss for Lack of Subject Matter Jurisdiction and a Motion for Post-Trial Relief fail, however, because they are unsupported by both the law and the facts.  Defendant's immunity argument is too late and does not impact this Court's subject matter jurisdiction, its standing argument fails because Wiener has a redressable injury, and its verdict-related contentions are belied by the evidence offered at trial. This Court should deny Defendant's Motions.

Defendant couches a potential immunity defense under the North Carolina Insurance Information and Privacy Protection Act ("NC Act") as a lack of subject matter jurisdiction because it has otherwise waived that defense. The Court's subject matter jurisdiction over Defendant's common law negligence claim, however, does not rise or fall based on the provisions of the NC Act.  Instead, as demonstrated by *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83

underwriting process.  This testimony provided clear evidence of a pattern of conduct concerning

the use of MIB codes within the life insurance industry:

> And when an insurance company, and in my experience, when an insurance
> company sees a significant number of MIB codes that are of significant concern,
> that they can simply say we're not interested in even starting the underwriting
> process. I mean, that's just the way that the industry works.

(Tr. 321-19-24).

Thus, according to Burgess, even the 5 or more carriers who declined to underwrite Wiener at all

could have been influenced by the incorrect MIB codes submitted by Defendant.

Defendant's primary response to the evidence offered by Wiener concerning the causal

link between Defendant's actions and Wiener's injury is to assert that the MIB's Vice President

and General Counsel, Jonathan Sager ("Sager"), testified that no other insurers accessed

Defendant's MIB codes.  However, that argument is nothing more than Defendant's attempt to

offer its own self-serving assessment of the credibility of the evidence rather than what a

reasonable jury could determine.

At trial, Sager testified that—without a subpoena or a court order and without knowing if

Defendant had a current policyholder relationship with Wiener—he "kind of took it upon himself

on my own initiative to look at [Wiener's MIB file], knowing that there was some controversy"

(Tr. 434:8-13), and then disclosed the fact that there was no other record of "inquiries" to

Defendant. (Tr. 437:2-10, 22-25; 438:1-8) (emphasis added).

Moreover, Sager confined his testimony to "inquiries" alone.  According to the MIB, "[a]n

'inquiry' represents a formal request by an MIB member company to search the MIB database for

information about an applicant." (Plaintiff's Ex. 15, p.3). In response to an "inquiry", the MIB

provides not only the coded medical information, but other personal information, "the dates that

other member companies made inquiries about the consumer" and the identity of the companies

reporting any MIB codes. (Plaintiff's Ex. 15, p.1). Sager testified that MIB's files going back to 1995 contain only three <u>inquiries</u> (by Defendant and its reinsurer, RGA). (Tr. 434:22-25; 435:1-2). When asked again if any other carrier "accessed" Wiener's MIB codes, Sager answered only in terms of inquiries:

> Q:  Were you able to determine if any carrier since AXA Equitable made its report in 2014 was able to determine whether they had accessed MIB's codes on Mr. Wiener?
> A:  Our file showed that there were <u>no inquiries</u> that were made after that report by AXA Equitable." (emphasis added)

(Tr. 435:3-7).

Whatever unexplained relevance the term "inquiry" may have for Sager, multiple witnesses offered countervailing testimony that insurance companies had accessed Wiener's MIB file and could access MIB codes without submitting a formal "inquiry" as defined by the MIB.  As explained above, Robbins testified that Security Mutual accessed Wiener's MIB codes as part of his informal application process. (Tr. 115:23-25; 116:1-11). Robbins further testified that he spoke with the life insurance companies with whom he sought replacement coverage for  Wiener and was told that the MIB file "had a coding in it that created an underwriting issue… [m]eaning to issue the policy at standard without a rating." (Tr. 122:4-13, 21-23).  Both Robbins and Burgess testified that, as a common practice, MIB members can and do access MIB codes without submitting a formal inquiry. (Tr. 124: 13-25; 125:1-4,14-25; 126:1-2).  Huffstetler provided testimony consistent with that fact, stating that she can use Defendant's own ESP system (its internal software) to obtain MIB codes of applicants. (Tr. 283:20-25; 284:1-2).

The testimony offered by Robbins, Burgess and even Huffstetler is contrary to or distinguishable from Sager's testimony and provides substantial and competent evidence for a reasonable jury to believe that insurers could and did access Wiener's MIB codes and Defendant's

bad acts actually and proximately caused Wiener's damages.[6] Judgment as a matter of law should not be granted "'if there was any evidence in the case that would authorize a verdict for the plaintiff.'" *Warner v. Billups E. Petroleum Co.*, 406 F.2d 1058, 1059 (4th Cir. 1969). As such, Defendant's motion should be denied.

**III.    The jury's verdict is not excessive and is supported by the evidence presented at trial.**

A reasonable jury would be justified in reaching the verdict in this action based on the evidence presented at trial. The jury heard testimony that Wiener sought to secure replacement life insurance coverage after Defendant reported false and misleading codes to the MIB, which rendered Wiener uninsurable and thus, unable to secure replacement life insurance coverage with a $16 million death benefit. Defendant contends the jury's verdict was not based upon sufficient evidence that comports with a legally accepted measure of damages, calling this matter a "loss of market" case in which the proper measure of damages is "one that puts the plaintiff in the same position he would have been had the [operative] representation been true." Doc. 131 at 18. This case, however, does not concern a "loss of market" measure of damages. Rather, this is a negligence case to which a "loss of market" measure of damages does not apply.

---

[6] A reasonable jury could have questioned the credibility of Sager based on his testimony concerning the MIB codes in Wiener's file. Defendant's own employees testified that Hodgins directed Sandra Huffstetler to report seven (7) codes to the MIB on March 12, 2014 (Plaintiff's Ex. 13; Tr. 152:1-8), which Huffstetler reported and entered on March 22, 2014 (Plaintiff's Ex. 21; Tr. 278:13-24; 283: 16-19). Huffstetler never received any indication or notice that the codes were entered incorrectly or not accepted. (Tr. 282:19-25; 283:1). Sager testified that Wiener's MIB file contained only four codes, but Defendant never provided any explanation for the discrepancy between the testimony of its own witnesses and that of Sager. In fact, Hodgins admitted that she changed Defendant's sworn interrogatory testimony regarding the codes reported for no other reason than a lawyer told her to do so. (Tr. 159:4-24). A reasonable jury could choose to believe the testimony of Robbins, Burgess, and Defendant's own employees rather than the self-serving and limited testimony of Jonathan Sager.